IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

## STATE OF TENNESSEE v. KEVIN WILKINS

**Direct Appeal from the Criminal Court for Shelby County**
**No. 97-13179-80     James C. Beasley, Jr., Judge**

---

**No. W1999-01462-CCA-MR3-CD - Decided - August 18, 2000**

---

The Defendant, Kevin Wilkins, was indicted by the Shelby County Grand Jury for the offenses of first-degree murder and especially aggravated kidnapping. He was subsequently convicted of both offenses after a jury trial, and he was sentenced to life without the possibility of parole for the first-degree murder conviction and to twenty-five years incarceration for the especially aggravated kidnapping conviction. In this appeal as of right, the Defendant asserts that the evidence was insufficient to support his first-degree murder conviction, that the trial court erred in instructing the jury regarding the law of accomplice testimony, and that the trial court erred in allowing the State to exhibit the skull of the victim to the jury. Because we conclude that the evidence was insufficient to support the Defendant's first-degree murder conviction, we reverse that conviction. The Defendant's conviction for especially aggravated kidnapping is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court Affirmed in Part; Reversed in Part.**

WELLES, J., delivered the opinion of the court, in which HAYES, J., and GLENN, J., joined.

Larry E. Fitzgerald, Memphis, Tennessee, for the appellant, Kevin Wilkins.

Paul G. Summers, Attorney General and Reporter, J. Ross Dyer, Assistant Attorney General, William L. Gibbons, District Attorney General, Paula Wulff and Patience Branham, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

The Defendant, Kevin Wilkins, was indicted by the Shelby County Grand Jury for the offenses of first-degree murder and especially aggravated kidnapping. He was subsequently convicted of both offenses after a jury trial. The jury sentenced the Defendant to life in prison without the possibility of parole for the murder conviction, and the trial court sentenced the Defendant to twenty-five years imprisonment for the especially aggravated kidnapping conviction, to be served consecutive to the sentence for first-degree murder. In this appeal as of right, the Defendant raises the following three issues: (1) whether the evidence was sufficient to convict the Defendant of first-degree murder; (2) whether the trial court erred in failing to properly instruct the

jury on accomplice testimony; and (3) whether the trial court erred in allowing the State to exhibit the skull of the victim before the jury. We conclude that the evidence presented is insufficient to support the Defendant's conviction of first-degree murder beyond a reasonable doubt. Accordingly, we must reverse the Defendant's first-degree murder conviction.

The evidence at trial established that sometime in the morning hours of April 30, 1997, an altercation occurred between two young children, who were two or three years old. This altercation led to an altercation between the mothers of the two children, which in turn led to an altercation between the boyfriends of the mothers of the children. The boyfriends of the mothers of the children were members of two rival gangs, the Vice-Lords and the Gangster Disciples. The altercation escalated into a shooting in which the uncle of the girlfriend of a Vice-Lord shot a Gangster Disciples member's hand. When the police arrived, the altercation was quelled. This all occurred in the Hurt Village Apartment area in a section of North Memphis in Shelby County, Tennessee.

Later that evening, a city-wide meeting of the Gangster Disciples took place at the Hurt Village apartment of a girlfriend of a member of the Gangster Disciples. About twenty to thirty members of the Gangster Disciples were in attendance. Three of the members who were there that evening testified for the State.

Christopher James testified that he was a member of the Gangster Disciples on April 30, 1997 and that he was present in the apartment when the meeting took place. He said that another member, called "Prentice," whom Mr. James described as a "coordinator" of the Hurt Village area gang members, came into the apartment and said that Vernon Green, the victim in this case, was "outside peeping around the corner watching at the apartment, looking out for the [V]ice-[L]ords." Mr. James said that he had known Vernon Green for seven years, that Vernon Green was "a friendly guy around the neighborhood," and that he had never known Vernon Green to be a member of any gang. Another member of the Gangster Disciples, "Greg," told some other members "to go snatch [Vernon Green] up" and bring him into the apartment. Four members left the apartment and returned with Vernon Green.

Mr. James testified that once Vernon Green was brought into the apartment, the gang member called "Greg" pushed Mr. Green down on the couch and started hitting him. He stated that after "Greg" finished hitting Mr. Green, other gang members started hitting Mr. Green. Mr. James said that someone named "Jarvis," someone called "Big Folk," and several people he did not know were hitting Mr. Green. Mr. James testified that the person called "Big Folk" who was striking Mr. Green was the Defendant, and he positively identified the Defendant as "Big Folk" in the courtroom. Although he said that he did not know "Big Folk" before the evening in question, he learned that night that the Defendant was called "Big Folk" and that "Big Folk" was "a high powered gangster" from the Mitchell Heights area of Shelby County.

Mr. James said that after the gang members beat Mr. Green for a period of time, two members took Mr. Green upstairs. Then, several gang members, whom Mr. James identified as "Prentice," "Jarvis," "Antonio," "Big Folk," and "Foo-Foo," went into the kitchen. When they returned, "Prentice" picked out six gang members, including the Defendant and the other members

who had been in the kitchen. "Prentice" then told Mr. James to stand up, which he did. The six members picked by "Prentice" proceeded to give Mr. James a "pumpkin head," which he explained was where six gang members hit a person on the head for six minutes, sixty seconds, until the person's head swells like a pumpkin. He said that he received the "pumpkin head" because he did not assist another gang member in the altercation earlier that day. He also said that the Defendant, or "Big Folk," was the first person to hit him during the "pumpkin head."

After the gang members finished giving Mr. James a "pumpkin head," the two members who had taken Mr. Green upstairs brought him back downstairs. One member called "Pooh" put a black T-shirt over Mr. Green's face. Mr. James said that Mr. Green was scared and shaking when he came back downstairs. Mr. James testified that he saw "Jarvis" and "Antonio" take Mr. Green by the arms and lead him out the door. "Foo-Foo" went out the door behind Mr. Green, and another member went out in front of Mr. Green. When Mr. Green was taken out the door, the Defendant was standing by the door. The Defendant then left the apartment. Mr. James said that "Antonio," "Jarvis," "Gregory," "Foo-Foo," and the Defendant all left the apartment at the same time as Vernon Green. He did not observe anything regarding these crimes after they left the apartment with Vernon Green. Mr. James testified that he had not been charged with any crime arising out of this incident.

Another member of the Gangster Disciples, James Lee White-Caradine, testified that he was also at the apartment in Hurt Village on April 30, 1997. He admitted that he was currently incarcerated for facilitation of especially aggravated kidnapping, arising out of the same incident. He said that he knew the victim, Vernon Green, as a "dude around the neighborhood."

Mr. White-Caradine testified that on the evening of April 30, he was in a room upstairs at the apartment in Hurt Village smoking marijuana with the females who were at the apartment. He said that he was upstairs because another gang member told him to go upstairs. At one point he tried to go downstairs because the women wanted to leave, but a person called "Jayrock" told him, "Nobody ain't going nowhere." "Jayrock" hit Mr. White-Caradine in the mouth with a gun, and Mr. White-Caradine went back upstairs. Mr. White-Caradine testified that he did not feel free to leave the upstairs room.

Mr. White-Caradine said that when he went downstairs to try to leave, he saw a person he knew as "Big Folk" standing behind "Jayrock" at the end of the staircase. "Big Folk" had a pistol and was telling people what to do. Other gang members had guns as well. Mr. White-Caradine said that he saw Vernon Green in the corner at the bottom of the staircase and that Mr. Green "was kneeling down like he was scared of some dudes." After he had gone back upstairs, Mr. White-Caradine heard noises like someone was "laying on the floor" in another room upstairs, and he heard someone say something like, "Man shut up, man, before you die here." He also heard noises "like somebody was getting beat up."

Mr. White-Caradine testified that he peeked out the door of the upstairs room at one point, and he saw Mr. Green going downstairs with other gang members. After he heard the door close downstairs, Mr. White-Caradine walked out of the room he was in and went into the room next door. He looked out the window from upstairs and saw Mr. Green walking outside with a shirt pulled up

over his head and his pants down. He said that "Prentice," "Big Folk," "Red dude," and some other people were outside with Mr. Green. He then testified that Mr. Green got into a vehicle with some of the gang members, including someone called "McAnthony," whose real name is Charles Pool. He said that "Big Folk" got into a different vehicle with some other gang members and that "Big Folk's" vehicle left in a different direction from the vehicle in which Mr. Green was traveling.

Although Mr. White-Caradine testified that he knew "Big Folk" and that "Big Folk" was at the apartment, he testified that the Defendant was not "Big Folk." He said that he thought "Big Folk's" rank was chief of security or something of that nature. He said that he did not know the Defendant. He testified that the Defendant was not at the apartment that night and that he had never seen the Defendant before he saw him in the holding tank. He did say that he knew Christopher James and that Mr. James received a "pumpkin head" that evening because he did not help "Jayrock," also known as "Jarvis," fight the Vice-Lords earlier that day. He said that he helped clean up the blood that Mr. James left on the couch. He also said that "Prentice" told the people who were left in the house that "anybody that needs to discuss what happens in the house is going to be the next person, because the same people that came and gone that time is going to come back again."

A third member of the Gangster Disciples, Charles Anthony Pool, also known as "McAnthony," testified that his rank in the gang was "security" and that his job was to "[m]ake sure things are safe." He said he knew "Big Folk" and that "Big Folk's" rank was also "security." He admitted that at the time of trial he was serving time due to charges of conspiracy to commit murder in the first degree and especially aggravated kidnapping, arising from the incident on April 30, 1997.

Mr. Pool testified that Jarvis Shipp called a meeting of the Gangster Disciples at the apartment in Hurt Village because of the altercation that had happened earlier in the day. The gang members came to the meeting from different areas of the city. Mr. Pool said that he knew the victim, Vernon Green, and that Vernon Green was in the apartment that evening. He testified that Jarvis Shipp and some other members went out and brought Mr. Green back to the apartment against his will. When Mr. Green was brought into the apartment, Mr. Pool was in the kitchen talking on the telephone. Mr. Pool stated that Mr. Green was beaten by the gang members after he was brought into the apartment, but Mr. Pool could not remember which gang members did the beating. He did say that the same members who beat Mr. Green then beat Mr. James for something that Mr. James had done earlier.

Mr. Pool stated that he was at the apartment for about an hour, and then he left. When he left, he left with Vernon Green, Jarvis Shipp, and some other members. He got into the back seat of a car with Vernon Green and Jarvis Shipp. He said that Mr. Green was in the middle. Mr. Pool stated that he did not know the person who was driving the car. That car, along with another car, drove to Bellevue Park. Mr. Pool testified that Charlie Golden, "Big Folk," and two persons he did not know were in the other car, and "Big Folk" was driving that car. He said that "Big Folk" arrived at the park first, and the car he was in pulled up behind "Big Folk." One of the members from "Big Folk's" car got some guns out of the trunk of "Big Folk's" car. Mr. Pool said he saw a shotgun and two hand pistols removed from the trunk. He said that when Vernon Green was taken out of the car, he was "begging for his life."

Mr. Pool testified that he was told "to go get on security." The cars were parked at the bottom of a hill, and the other gang members took Vernon Green up the hill while Mr. Pool remained at the bottom of the hill on "security." Mr. Pool said that everyone "was packing guns." He said that "Big Folk," Charlie Golden, also called "Foo-Foo," and the other members were up on the hill with Vernon Green. "Big Folk" was standing "up above" Mr. Green on the hill. Mr. Pool heard Mr. Green getting shot. He stated that he heard two or three shots.

Vernon Green was found dead the next morning in Bellevue Park. He was found with his pants pulled down and his shirt pulled up over his shoulders. He had been shot in the buttocks, in the back, and in the head.

Although Mr. Pool testified about various things that "Big Folk" did that evening, he also insisted that the Defendant was not "Big Folk." He said that he had seen the Defendant "driving around" before, but he did not know the Defendant, and the Defendant was not in the apartment or on the hill that night. When the State attempted to question Mr. Pool about whether the Defendant was "Big Folk," Mr. Pool responded, "the one that y'all saying is Big Folk, it doesn't look like him. Like I was telling you over there, he's too little to be him. That guy right there. I don't know him. He's too little to be Big Folk."

Dr. Thomas Deering was certified as an expert in the field of forensic pathology, and he testified that the cause of Mr. Green's death was multiple injuries to the head. He said that Mr. Green had three gunshot wounds to the head, a gunshot wound to the buttocks, and a gunshot wound to the back. He offered the opinion that the wounds to the buttocks and back would not have been fatal, but they would have been painful. They were both made with a shotgun. Due to the amount of bleeding, Dr. Deering determined that the wound to the buttocks was made while Mr. Green was still alive.

Using Mr. Green's skull, which had been cleaned and reconstructed, Dr. Deering explained the gunshot wounds to the head. He testified that there was one shotgun wound to the head and two handgun wounds. He explained that the shotgun wound was the most devastating, as it shattered the skull. Because of the path of the bullets and the fractures that they made, he was able to determine that the shotgun wound occurred before one of the handgun wounds. He was unable to determine when the other handgun wound was made. Dr. Deering testified that he recovered shotgun pellets from throughout Mr. Green's head, he recovered one bullet which was floating free in the material within the brain, he recovered another bullet which was lodged in Mr. Green's neck, and he recovered a bullet jacket from the back of Mr. Green's throat. He testified that after being shot in the head, Mr. Green would have died quickly.

SUFFICIENCY OF THE EVIDENCE

The Defendant first challenges the sufficiency of the evidence. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). Evidence is sufficient if, after reviewing the

evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979). In addition, because conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal defendant bears the burden of showing that the evidence was insufficient. <u>McBee v. State</u>, 372 S.W.2d 173, 176 (Tenn. 1963); <u>see also</u> <u>State v. Evans</u>, 838 S.W.2d 185, 191 (Tenn. 1992) (citing <u>State v. Grace</u>, 493 S.W.2d 474, 476 (Tenn. 1976), and <u>State v. Brown</u>, 551 S.W.2d 329, 331 (Tenn. 1977)); <u>State v. Tuggle</u>, 639 S.W.2d 913, 914 (Tenn. 1982); <u>Holt v. State</u>, 357 S.W.2d 57, 61 (Tenn. 1962).

In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." <u>Tuggle</u>, 639 S.W.2d at 914 (citing <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978)). The court may not "re-weigh or re-evaluate the evidence" in the record below. <u>Evans</u>, 838 S.W.2d at 191 (citing <u>Cabbage</u>, 571 S.W.2d at 836). Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment. <u>Tuggle</u>, 639 S.W.2d at 914.

The Defendant argues that the evidence was insufficient to convict him of first degree murder because there was insufficient evidence to corroborate the testimony of Charles Pool, an accomplice, who provided the details regarding where and how Vernon Green was killed. It is well settled in Tennessee that a conviction cannot be based upon the uncorroborated testimony of an accomplice. <u>State v. Bigbee</u>, 885 S.W.2d 797, 803 (Tenn. 1994); <u>Monts v. State</u>, 379 S.W.2d 34, 43 (Tenn. 1964). An accomplice is "'a person who knowingly, voluntarily, and with common intent with the principal offender, unites in the commission of a crime.'" <u>State v. Caldwell</u>, 977 S.W.2d 110, 115 (Tenn. Crim. App. 1997) (quoting <u>Clapp v. State</u>, 30 S.W. 214, 216 (Tenn. 1895)). To corroborate the testimony of an accomplice,

> there must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence. The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration.

<u>Bigbee</u>, 885 S.W.2d at 803 (quoting <u>State v. Gaylor</u>, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992)).

In the instant case, the only witness tying the Defendant to any of the events in question on the night of April 30, 1997, was Christopher James, who was not an accomplice. Mr. James testified that the Defendant was in the apartment in Hurt Village during the meeting of the Gangster Disciples, that the Defendant was known by the name of "Big Folk," that the Defendant participated in beating the victim, Vernon Green, and that the Defendant participated in the beating of Mr. James. Mr. James also testified that the Defendant left the apartment at the same time as Vernon Green and some of the other gang members. Mr. James had no personal knowledge of the events that transpired after the Defendant left the apartment.

Charles Pool, who was an accomplice, then testified to the events that happened after Vernon Green was taken out of the apartment. He testified that he was driven to Bellevue Park in the same vehicle as Vernon Green and that a person he knew as "Big Folk" was driving another car that went to Bellevue Park. He then described how guns were removed from "Big Folk's" trunk, how Vernon Green was taken up the hill at the park, and how Vernon Green was shot. If he had also testified that the Defendant was the same "Big Folk" who was at the park and who participated in the murder of Vernon Green, then we would have no hesitation in concluding that the independent testimony of Christopher James that the Defendant was "Big Folk" and that he left the apartment at the same time as Vernon Green and some of the other gang members was sufficient to corroborate the testimony of Charles Pool, an accomplice. Though inadequate in and of itself to establish that the Defendant participated in the murder of Vernon Green, Mr. James' testimony would implicate the Defendant in the murder, providing sufficient corroboration. See id. However, Charles Pool testified that the Defendant was not the "Big Folk" who was at the apartment and at the park and that he did not know the Defendant. Similarly, James White-Caradine, another gang member, testified that the Defendant was not the same "Big Folk" whom he saw at the apartment and whom he saw leaving the apartment at the same time as Vernon Green. Mr. White-Caradine also testified that he did not know the Defendant. Thus, there was no evidence directly establishing the Defendant's participation in the murder of Vernon Green.

Looking at the evidence in the light most favorable to the State, the evidence establishes that the Defendant participated in the detention and beating of Vernon Green and that he left the apartment at the same time as Vernon Green. The evidence then establishes that someone called "Big Folk," who was not the Defendant, participated in the murder of Vernon Green. While this evidence supports the especially aggravated kidnapping conviction, it does not establish beyond a reasonable doubt that the Defendant committed first-degree murder.

When the trial judge addressed this issue at the hearing on the motion for a new trial, he stated that the identity issue was a credibility issue for the determination of the jury and that the jury accredited the testimony of Mr. James that the Defendant was "Big Folk." Accepting this as true, there was nevertheless no evidence presented to establish that the Defendant was the same "Big Folk" who went to Bellevue Park and participated in the murder. To reach such a conclusion, the jury would have had to determine that Mr. Pool and Mr. White-Caradine were being untruthful when they said that they did not know the Defendant and that the Defendant was not the "Big Folk" that they saw that night, and the jury would have had to infer that the Defendant was in fact the same

"Big Folk" that the witnesses knew and that they did see him that night. While such an inference might establish the Defendant's guilt by a preponderance of the evidence, we conclude that a rational jury could not have found the Defendant's guilt beyond a reasonable doubt based on such an inference. Accordingly, we are compelled to reverse the Defendant's first-degree murder conviction due to insufficient evidence of the Defendant's guilt. Although not necessary because of our resolution of this issue, we will briefly address the Defendant's other two issues.

## JURY INSTRUCTION ON ACCOMPLICE TESTIMONY

Prior to beginning jury deliberations, the trial court instructed the jury on the law concerning accomplice testimony. After deliberating for a period of time, the jury returned with a question concerning the testimony of Charles Pool. The question was phrased as follows: "If we feel Charles Pool is an accomplice, can we only use portions of his testimony to draw conclusions regarding events that occurred, while disregarding other parts of his testimony?" After discussing the question with both parties, the trial court gave the jury a general instruction on how it should judge the credibility of witnesses. The Defendant objected to the trial court's instruction, and he now argues that the instruction did not properly answer the jury's question. We disagree.

During the initial jury instructions, the jury was instructed that a conviction could not be based on the uncorroborated testimony of an accomplice. When the jury returned with a question, it indicated that it thought Mr. Pool was an accomplice, but its question was not really about Mr. Pool being an accomplice. The jury wanted clarification about whether it could believe portions of Mr. Pool's testimony while disregarding others. The trial court then gave a correct instruction on judging the credibility of witnesses, informing the jury that it could believe all, none, or portions of any witness's testimony. The jury foreman indicated that this instruction answered the jury's question, and the jury returned to deliberations. We see no error in this instruction.

## EXHIBITION OF THE SKULL TO THE JURY

Finally, the Defendant argues that the trial court erred in allowing the State to exhibit to the jury the actual skull of the victim. He argues that the exhibition of the skull was meant to inflame and arouse the emotions of the jury and that any probative value was clearly outweighed by the danger of unfair prejudice against him.

The admission of relevant evidence is a matter within the sound discretion of the trial court, and this Court will not disturb the trial court's ruling absent a clear showing of an abuse of that discretion. See State v. Cauthern, 967 S.W.2d 726, 743 (Tenn. 1998); State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). Generally, all relevant evidence is admissible, unless otherwise excluded by law. See Tenn. R. Evid. 401, 402. However, the trial court may exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403.

Here, the State informed the trial court that it wished to have Dr. Deering, the expert in forensic pathology, use the cleaned and reconstructed skull of the victim to help explain his

testimony regarding the gunshot wounds to the victim's head. The State asserted that the testimony was relevant and essential to proving premeditation, because the evidence showed that this was an "execution style" murder. The Defendant countered with the argument that the skull was meant to merely inflame the emotions of the jury. The trial court then conducted a jury-out hearing, wherein it listened to Dr. Deering explain the injuries to the victim's skull while using the skull as a demonstrative tool. The trial judge then stated,

> Well, I'm of the opinion and obviously I can see where there could be some prejudicial influence to the defendant, or towards the defendant. But, I also find that the state has an obligation of proving it's [sic] case as far as in this case the charge involves the allegation of premeditation. And in light of the testimony with regard to being an execution type killing, I think that there is some probative value, obviously to the state being allowed to prove the manner in which these shots were fired and the damage that was done and the purpose. And I think that's part of the purpose that the medical examiner is being called to testify.

We agree with the trial court that the skull was relevant and probative of the issue of premeditation. We also recognize that our supreme court has stated on multiple occasions that a cleaned and reconstructed skull is no more prejudicial or gruesome than a model or diagram would have been. See State v. Pike, 978 S.W.2d 904, 925 (Tenn. 1998); State v. Cazes, 875 S.W.2d 253, 263 (Tenn. 1994); State v. Morris, 641 S.W.2d 883, 888 (Tenn. 1982). Accordingly, we conclude that the record supports the trial court's finding that the probative value of the skull was not outweighed by the danger of unfair prejudice, and the trial court did not abuse its discretion in allowing the State to use the victim's skull during Dr. Deering's testimony.

## CONCLUSION

Because we conclude that the evidence establishing the identity of the Defendant as a perpetrator of the victim's murder was insufficient to establish the Defendant's guilt of first-degree murder beyond a reasonable doubt, we reverse the Defendant's first-degree murder conviction. The Defendant's especially aggravated kidnapping conviction is affirmed.